In the Matter of the Appointment of a Guardian of the Person of MARION INGERSOLL, an Infant.

Surrogate's Court, Broome County, April 19, 1948.

*Walter J. Relihan* for Marion I. Myott, petitioner.

*Frank P. Rizzuto* for Ralph Davis, Jr., respondent.

Page, S. The requisite contents of a petition for the appointment of a general guardian of an infant are prescribed by section 176 of the Surrogate's Court Act. The present proceeding was instituted by the petition of the infant's paternal grandmother, Marion I. Myott, and complies with the requirements of the section, except that there is no allegation as to whether or not the infant owns or has any interest in any property of any kind. An uncontradicted statement was made in the course of one of the adjourned hearings to the effect that the infant has no property. But, if there is any question about this, a further hearing will be allowed to any party desirous of raising any such question before the decree herein.

An answer by respondent, Ralph Davis, Jr., uncle of said infant, was filed herein. This pleading, although labeled an '' answer '', does not controvert any allegation of the petition and amounts only to a cross application by said respondent to be appointed as guardian, failing, however, to contain a number

of the essential allegations of such a petition as required by section 176 of the Surrogate's Court Act.

The nature of a proceeding for the appointment of an infant's guardian does not need to be treated as are proceedings generally in respect to pleadings because of the provision of section 179 of the Surrogate's Court Act, providing, among other things, that: "The surrogate may, in his discretion, appoint a person other than the father or mother of the infant, or other than the person nominated by the petitioner." Of course, the Surrogate should not take such action without evidence comprising a full investigation of each of whatever possible and practicable dispositions of the guardianship there may be. In the present case, the comparative merits of the petitioning grandmother and opposing uncle have been fully developed.

As has been authoritatively stated: "He [in this case, the Surrogate] is not adjudicating a controversy between adversary parties, to compose their private differences. * * * Equity [in cases of infants' guardianships] does not concern itself with such disputes in their relation to the disputants. *Its concern is for the child."* (Italics supplied.) The above quotation is taken from *Finlay* v. *Finlay* (240 N. Y. 429, 434). Many cases, in fact practically every case of a disputed guardianship of an infant or, more frequently, proceedings by way of habeas corpus involving an infant's custody, emphasize and re-emphasize the paramount consideration in all such cases, viz., *the welfare of the child.*

The hearing in the present proceeding has consisted of a competition between the contending parties, each endeavoring to show that her or his own home and household is the better from the standpoint of the infant and would be to her advantage.

During the course of hearings, it has been developed by the evidence that Marion Ingersoll was born at her said grandmother's home on October 19, 1936, and is, therefore, now eleven years of age. Although she was with her parents through her seventh year, her grandmother had more or less to do with her care during this period. Her mother died August 20, 1943. Several months thereafter, in 1944, her father was discharged from the army and took Marion, together with two others of his five children, to live at a home he had set up at Owego, N. Y. There the father and children, together with his sister-in-law, lived in the same house with the respondent, Ralph Davis, Jr. and his wife. It appears that the mutual attachment that had grown up to some extent between Marion and her uncle Ralph

(respondent, Ralph Davis, Jr.) was intensified by the child's living in the same house with him until sometime early in 1947, when Marion's father removed to Florida, having left her with her uncle Ralph. Sometime while he was in Florida, he had Marion and one of the other children brought down to him there by some other people who were making the trip. About July, 1947, he returned from Florida and immediately placed Marion back with her uncle Ralph, he having no home of his own at that time. It may be somewhat significant that he did not place her with his own mother. At any rate, it appears that the father's choice was the child's uncle, his own brother-in-law, Ralph Davis, Jr. Shortly after this, he met with a tragic death and just before then, as it appears, he reiterated his desire that his daughter Marion should remain as a member of the household of Ralph Davis, Jr., and in his charge.

In a case like this, the earnest endeavor of the functionary charged with responsibility for a child's future welfare must be to weigh the probabilities in relation to all elements bearing upon her future welfare and happiness, as well as it is humanly possible to do so, not only from a strictly material, but also from a psychological standpoint.

As far as financial ability is concerned, it would seem that petitioning grandmother, Mrs. Myott, with the co-operation which it appears she would have, of her husband, Albert Myott, would be superior. The latter has an annual income of about $6,000, and owns considerable property, has a very good home and both the petitioner and he appear to be first-class and reliable persons.

The alternative disposition is granting the application of Ralph Davis, Jr., to become the guardian and, incidentally thereto, thereby placing him in charge of the girl's future for, prospectively, the next nine years. He is not in so strong an economic position as the grandmother. However, he is a young man of about twenty-six years of age and a veteran of five years' service in the army, earns from a minimum of $50 to a maximum of about $70 per week, but has no other source of income and has other dependents, consisting of his wife and two young children. He has a very good present home with his own grandmother, for which he is required to pay nothing, but takes care of her to some extent.

The respondent, Ralph Davis, Jr., and his wife, Geraldine, have had the actual custody of Marion Ingersoll since only about a year ago, sometime early in 1947. As previously noted, before then, they had lived upstairs in the same house where Marion, with her father, had lived downstairs in a house on

Page Street in Owego, N. Y. Her uninterrupted custody has been held by the Davises since about July, 1947, when the child's father placed her with them upon his return from Florida.

Although this is not a long period of time, yet it appears to have been of sufficient length to have brought about a change in the situation of Marion, such that it should not lightly be disturbed, and should not be altered at all in the absence of a fairly strong showing that she has not been as well cared for as the present circumstances would permit for her future, if only the best judgment is used in determining with whom she should be placed. By the professions of both of them and as it otherwise appears, there is a strong bond of affection existing between Marion and her uncle, respondent herein. Also, there is no reason to doubt but that Ralph's wife gets along very well with Marion. According to her own testimony, this is so, and she and her husband have treated the child as one of their own and would continue to do so. She is doing notably better in school with the Davises than she had done previously. She has settled school connections now which would have to be disrupted if the petition herein is granted. Her appearance is that of a very good-appearing, well-cared-for young girl, indicating all the basic necessities of living have been very well supplied to her. Also, it appears that she regards the Davises as a child would her own parents where the relationship of parent and child is on an ideal basis. Every indication points to her having been and being in an environment and enjoying home surroundings which are proving very suitable to her mental and moral, as well as physical development. There is no reason whatever to indicate there is any factor to the contrary except that it was shown that the Davises had not encouraged or made it possible for the girl to have any religious affiliation. But the remedying of this defect in the child's up-bringing was solemnly promised by Mr. Davis on condition that he be permitted to retain her custody. Nothing has been shown to indicate that the uncle, Ralph Davis, Jr., and his wife, are other than persons of good character or that dependence upon their good faith and serious endeavor to take good care of Marion could not be reposed.

One home would be as good as the other for this child in the sense that either one of them holds a reasonable guarantee of providing her adequately with all the necessities. While the grandparents are in a better economic position, this is to be expected, considering the difference in age between them and the Davises. Ralph Davis, Jr., appears to be a young man of good

earning ability and has demonstrated that there is no sound reason to doubt his continued ability to provide for such a number of dependents as he has now, or even if his family should have an additional member or two.

The preponderating factor in the present question is the attitude displayed by the infant herself, expressive of affection for her grandmother, but stating good, nonchildish reasons why she wants to stay where she is. Against this, it has been argued that she is only a child and; therefore, may be assumed to be unstable or undeveloped in her judgments and estimates of conditions affecting her personal situation. She testified at some length and was carefully and closely examined by counsel for both sides and also by the court. If she had been coached for this testimony, it was, unquestionably, an extraordinary accomplishment in coaching. The questions were of such a nature as to fully and fairly test her past experience, present situation and future outlook. Surely not all of them could have been anticipated and it is equally certain that she testified in a straightforward, frank, intelligent and moderate manner in her attitude toward both of her contending sets of relatives.

The effect of each of the successive comprehensive examinations of Marion Ingersoll served only to accentuate the personal reasons she had for all the major considerations she had stated in her direct testimony elicited by counsel for her uncle. Her response to all questions throughout was highly intelligent for a girl of eleven years of age. In cases of disputed guardianships, where an infant is fourteen or more years of age, his attitude is given great weight and consideration and he is, primarily, the requisite petitioner. (Surrogate's Ct. Act, § 175.) If it can be readily seen that, although the infant is less than fourteen years of age, she is at least equally as intelligent, if not more so, than would normally be expected to be found in the case of an infant upwards of fourteen years of age, the court should be governed accordingly.

The practically controlling consideration derived from the testimony of Marion and otherwise substantiated is that she is very contented and happy where she is, and, although she is fond of her grandmother, she is very definitely of the opinion that she would be in an unhappy situation were she to be placed with her, despite the fact that she has custody of her younger sister. This is so particularly because of certain associations she would, necessarily, have to resume if she lived in her grandmother's household. Among these circumstances there is the,

as she claimed, previously demonstrated disposition of her step-grandfather to keep her under quite severe discipline and her inability to get along well with an adopted boy of her grandparents of about her own age.

Even though these conditions might not seriously affect her physical well-being, still her mental attitude in regard to them is such that it is to be seriously apprehended that these circumstances, together with the great, at least temporary, grief which she would feel in being uprooted from where she is, would tend to produce an unfavorable result that ought to be anticipated and prevented at the present juncture. Many things along this line might be anticipated or conjectured but, chiefly, there is to be considered the danger of destroying a present favorable psychosis and, at the same time, running a serious risk of engendering a deleterious one. There is no telling what psychical reaction might be produced whereby a change from a happy healthy girl to a neurotic individual, either very soon or in after years, or both, might be wrought. I feel very definitely that there would be much more reason for apprehension of having "guessed wrong" if the award of guardianship were to be made in accordance with the prayer of the petition herein. The safer course to pursue from the only standpoint we may take in a case like this, viz., the infant's welfare, is to "let 'good-enough' alone", by which quaint expression is meant that Marion Ingersoll should be left where she is and that, if the appointment of a general guardian of her person is deemed necessary, such guardian should be the child's uncle, Ralph Davis, Jr.

The foregoing discussion shows the consideration of economic and other factors in relation to the personal situation of each of two possible guardians for the infant. This does not mean that a mistaken assumption that a guardianship proceeding is tantamount to an adoption or habeas corpus underlies the reasoning. But here each of the prospective or would-be guardians has taken the position of desiring and promising to fulfill all the duties of a parent. This is the reason for practically treating the situation as if the parties were (as in habeas corpus) liable, or to become (as in adoption) so liable. There appear to be no specific duties of a general guardian of the person as such in New York delineated in article 6 of the Domestic Relations Law, or any other statute. It nowhere appears that such guardian is liable or assumes liability for the maintenance and support of a ward at the guardian's own

personal expense, even to the extent of a crust of bread or cup of water. It is, therefore, anomalous that a prospective guardian's ability and willingness to support the ward is a relevant consideration upon the question as to who should be appointed. The present case is an extreme instance of how close the criteria in relation to determining a guardianship may come to the usual contending considerations in some habeas corpus proceedings or in any adoption. Even with the guardianship issue determined, from a standpoint of legal liability to her, the child's situation is still insecure. It depends on the continuation of having relatives able and willing to voluntarily provide an adequate home for her. A legal adoption would be a better permanent solution of her situation.

Decree in accordance with this decision may be submitted upon eight days' notice.